LLOYD HUMPHRYS *v.* FRANCIS BEACH

BALDWIN, C. J., KING, MURPHY, SHEA and ALCORN, Js.

---

Argued October 4—decided November 7, 1961

*Philip Reich,* with whom, on the brief, was *George Balter,* for the appellant (defendant).

*John F. James,* for the appellee (plaintiff).

MURPHY, J.  In 1956, the plaintiff was the owner of a barn in which for twelve years he had been conducting a boarding and training school for horses and a riding school.  An explosion and fire de-

stroyed the barn, the equipment in it, and two horses. The plaintiff brought suit to recover his losses, alleging that the fire had been caused by the spontaneous combustion of baled hay which the defendant had sold to the plaintiff and had delivered and stored in a hayloft in the barn. The case was tried to the court, which rendered judgment for the plaintiff to recover $21,500 in damages. The defendant has appealed.

The complaint is in two counts. The first count alleges a breach of warranty in that the defendant warranted the hay to be properly cured and free from moisture, when in fact it was green and uncured, with a high moisture content. The second count alleges negligence in not storing the improperly cured hay so as to avoid spontaneous combustion. The court found the issues for the plaintiff on both counts. Briefly stated, the defendant's appeal covers three main issues: the refusal of the court to include in its finding of facts the dimensions of the hayloft, as testified to by the plaintiff, and the computation of the cubic content of the loft based on those dimensions; the lack of competent expert testimony as to the cause of the fire; and the inclusion in the damages of an award for loss of profits when there was insufficient evidence to sustain such an award.

Many of the basic facts are undisputed. The outside dimensions of the plaintiff's wooden barn were approximately forty-six feet by fifty-four feet. The greater part of it was occupied by a shed containing stalls for horses. The barn, on the ground floor, contained horse stalls on the north and south sides of a passageway fourteen feet wide. There were double doors at each end of the passageway. Nine feet above the ground level, two haylofts were lo-

cated directly over the two rows of stalls. There was an open space above the passageway. The ridge of the barn roof extended from north to south, twenty-one feet above the hayloft floors. The walls of the lofts were of tongue and groove construction, tightly butted. The roof was wood sheathing covered with roofing paper and wooden shingles. On or about July 23, 1956, the defendant delivered to the plaintiff a load of over 300 bales of timothy hay, each bound with two wires, and stored about 292 of them in the empty north loft. Their cubic content was approximately 2044 cubic feet. Three feet below the roof peak in this loft there was a window frame two feet square and covered with burlap. The south loft was practically empty. Prior to July 31, 1956, several bales were removed from the north loft for use. On the evening of that day, an explosion over the north loft blew a large hole in the roof. The fire followed. There were no electric lights, fixtures or wiring on the north side of the barn.

The defendant has not attacked the finding and conclusion of the court that he warranted that the hay was properly cured and free from moisture and would not ignite from spontaneous combustion. He maintains that it was good, dry timothy hay which had been properly cured and that it would not spontaneously ignite. Furthermore, it is his claim that the amount of baled hay in question could not have been packed so tightly in the north loft that the heat generated in it would fail to be dissipated rapidly. He asserts, therefore, that spontaneous combustion could not occur.

There was abundant evidence that the hay was wet, green and warm and looked like grass, and also that the bales were packed tightly in the loft, right

up to the roof, with no air space around or above them. They completely obstructed the window opening in the north wall and prevented it from venting the loft. Two days before the fire, one of the patrons of the plaintiff's riding school broke open a bale which had been pulled from the loft and found the interior of it to be quite hot. Another patron, a day or two before that, pulled down two bales and upon opening them found the hay to be warm. Coupled with these facts was the testimony of two witnesses who were offered as experts by the plaintiff. One was an assistant chief of the Bridgeport fire department who had made a study of, and had had special training in, the causes and prevention of combustion. While he had had no personal experience with hay, he testified as to the propensity of vegetable matter to generate heat and combustible gases within its own mass when it is confined in a space having insufficient ventilation to dissipate heat. As a result, the gases build up pressure and cause a backflash or minor explosion as they become heated to the ignition point. They burst into flame, expand, and violently explode. In essence, the testimony amounted to a statement that in late July, in this area, tightly packed wet hay in such a barn as the one here would generate heat and combustible gases, and as a result there would be an ignition and a backflash, followed by an explosion which might possibly have enough force to burst the roof. The fact that the hayloft was open on one side would not, in his opinion, eliminate the danger of spontaneous heating in the hay, because it is the lack of circulation of air in the mass itself which creates spontaneous ignition followed by combustion. No claim was advanced by the defendant that timothy hay is not a vegetable product.

The other expert witness was an adjuster of fire losses with more than thirty years' experience. He had investigated around 200 fires caused by spontaneous combustion in hay; about one-third of them had occurred in baled hay. From his experience, he testified that a mass of wet hay would produce heat which would rise and, unless there was adequate ventilation, would build up gases at the top of the mass. These would ignite and then explode. A violent fire would follow. Such an explosion would be sufficient to blow a hole in a shingle roof.

Another witness for the plaintiff had been a farmer for fourteen years. He had had experience in raising and selling hay in conjunction with his farming operations and had also been in the hay business for three years, buying, trucking and selling hay from Canada and New York. He testified that he believed that spontaneous combustion would result where approximately twelve tons of hay in bales bound with two wires were stored in the haymow of a barn in this area in the latter part of July, with little or no air space above the hay or around it except on one side.

The ultimate conclusion which the court reached was that the fire was caused by the spontaneous combustion of improperly cured hay which had been stored in a negligent manner by the defendant. To support this conclusion, it was not necessary that the expert witnesses give as their opinion that it was "reasonably probable" that the fire resulted in this way. Under the facts of this case, the opinions of these witnesses as to what could happen under certain circumstances were sufficiently corroborative of the direct evidence as to what did happen for the trier to be able to reach, properly, the conclusion it did. See *Madore* v. *New Departure Mfg. Co.,* 104

Conn. 709, 714, 134 A. 259. That the opinion of an expert offered by the defendant was in conflict with the opinions of other witnesses did not require the court to accept his thesis or reasoning. *Ball* v. *Branford,* 142 Conn. 13, 17, 110 A.2d 459.

In one of his assignments of error, the defendant attacked the failure of the court to find, as requested in his draft finding, that the floor area of the loft in which the hay was stored was fourteen feet by forty-five feet and that therefore the hayloft contained 6616 cubic feet of space. Although the plaintiff testified to the foregoing dimensions of the floor and did not dispute them in the counterfinding which he filed pursuant to Practice Book § 389, the court did not incorporate them in its finding. In a memorandum concerning the assignment of errors, the court pointed out that the plaintiff was obviously mistaken in his testimony as to the dimensions of the loft and that it elected to disregard them in making the finding. The finding in a court case recites the facts as the trier finds them from the evidence. It is the finding of the judge, and he is not bound by any admission made in a counterfinding. *Neubauer* v. *Liquor Control Commission,* 128 Conn. 113, 116, 20 A.2d 669; *Wilson* v. *M & M Transportation Co.,* 125 Conn. 36, 42, 3 A.2d 309. The defendant is not entitled to any corrections in the finding.

The court included in the award of damages $3500 for loss of profits during the time the plaintiff was out of business as a result of the fire. There was evidence that the profit in 1955 was $3500, and that it was about half of that amount during the first half of 1956. The plaintiff was out of business for a year and three months. During this period, he had the expense of keeping his horses while there was no income from them. The question of lost profits is

one of fact, presenting greater or lesser obstacles according to conditions peculiar to the case in which it arises. That damages by way of loss of expected profits may be difficult of exact proof in no degree impairs the theory upon which they are allowed. *Tompkins, Inc.* v. *Bridgeport,* 94 Conn. 659, 684, 110 A. 183. Damages for losses of profits are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty. *Doeltz* v. *Longshore, Inc.,* 126 Conn. 597, 600, 13 A.2d 505. In the absence of evidence to the contrary, the court was entitled to draw the inference that the plaintiff's business would continue to be as profitable as it had been in the year and a half before the fire. *Kay Petroleum Corporation* v. *Piergrossi,* 137 Conn. 620, 625, 79 A.2d 829. Actually, the amount awarded was less than it would have been had the court followed the literal application of this rule.

There is no error.

In this opinion the other judges concurred.